IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| BANNUM, INC., | ) |  |
|    a Kentucky corporation headquartered at | ) |  |
|    2546 Success Drive | ) |  |
|    Odessa, Florida 33556, | ) |  |
|  | ) |  |
|       Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Case No. 1:15-cv-1233-ABJ |
|  | ) |  |
| CHARLES E. SAMUELS, JR., | ) |  |
|    320 First Street, N.W. | ) |  |
|    Washington, DC 20534, | ) |  |
|  | ) |  |
| CATHERINE SCOTT, | ) |  |
|    a citizen of Maryland residing at | ) |  |
|    4520 Stratford Road | ) |  |
|    Pomfret, Maryland 20675, | ) |  |
|  | ) |  |
| TIMOTHY R. BARNETT, | ) |  |
|    a citizen of Maryland residing at | ) |  |
|    954 Fall Ridge Way | ) |  |
|    Gambrills, Maryland 21054, | ) |  |
|  | ) |  |
| CHERYL DENNINGS, | ) |  |
|    a citizen of Georgia residing at | ) |  |
|    7344 Hillview Court | ) |  |
|    Douglasville, Georgia 30134, | ) |  |
|  | ) |  |
| LOLA LEE-BROWN, | ) |  |
|    a citizen of Texas residing at | ) |  |
|    4238 Jamaica Street | ) |  |
|    Dallas, Texas 75210, | ) |  |
|  | ) |  |
| OSORIA TOSTON, | ) |  |
|    a citizen of Texas residing at | ) |  |
|    192 Mountain Laurel Road | ) |  |
|    Wetumpka, Alabama 36093, | ) |  |
|  | ) |  |
| AND | ) |  |

```
                                              )
ANDREA JOHNSON,                               )
     a citizen of Texas residing at           )
     2107 Sweet Adeline Lane                   )
     Keller, Texas 76248,                       )
                                              )
     Defendants.                              )
_____)
```

## FIRST AMENDED COMPLAINT

Plaintiff, Bannum, Inc. ("Bannum"), for its first amended complaint against Defendants Charles E. Samuels, Jr., Catherine Scott, Timothy R. Barnett, Cheryl Dennings, Lola Lee-Brown, and Osoria Toston, alleges and avers as follows:

## INTRODUCTION

1.      This is an action seeking declaratory relief, a permanent injunction, and monetary and other relief based upon the *de facto* debarment of Plaintiff Bannum, Inc. ("Plaintiff" or "Bannum"), a contractor for the Federal Bureau of Prisons ("BOP") by Defendants.

2.      As described more fully herein, Defendants have engaged in a pattern of conduct over the past several years that has had the effect of debarring Bannum from receiving any new contracts from the BOP, Bannum's sole customer.

3.      In addition, Defendants have intentionally interfered with Bannum's contractual relationship with the BOP through their conduct and actions and have misused their positions to interfere with, disrupt, and destroy Bannum's contractual relations, prospective contractual relations, and Bannum's business as a whole.

4.      Bannum seeks a determination by this Court that these *de facto* debarments violate Bannum's Fifth Amendment rights to due process of law, as Bannum has received no

notice of the charges upon which the debarments are alleged based, and has not been given an opportunity to rebut any such charges.

5.     Bannum also seeks injunctive relief, prohibiting Defendants from taking any action implementing or enforcing the debarments.

6.     Bannum further seeks a determination by this Court that Bannum has been defamed in its trade and business and is the victim of a civil conspiracy to deprive it of its contractual rights and business.   Bannum also seeks an award of damages based on this determination.

7.     Bannum further seeks judgment and an award of damages against certain Government employees personally, based on the judicial qualification to the immunity rule for the official acts of Government employees which provides that they are not immune from personal liability for acts taken in their official capacity where their conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known.

<u>PARTIES</u>

8.     Bannum, Inc. is a corporation organized and existing under the laws of the State of Kentucky, with its principal place of business located in Clearwater, Florida.   Bannum operates approximately six (6) Residential Reentry Centers ("RRCs[1]") for federal offenders throughout the United States pursuant to contracts with the Federal Bureau of Prisons.   Bannum has RRCs located in several states throughout the country.   Bannum recently had approximately

---

[1] The nomenclature for such facilities has changed over the years.   These facilities have colloquially been referred to as "halfway houses," and have also been labeled as "Community Corrections Center."

3

seventeen (17) different RRCs prior to the Defendants' attempts to eliminate Bannum from BOP contracting.  John D. Rich is the President and Corporate Counsel of Bannum.

9.      Defendant Charles E. Samuels, Jr. is the Director of the Federal Bureau of Prisons.

10.     Defendant Catherine Scott is the Chief of the BOP National Acquisitions and Systems Section, and, upon information and belief, resides at 4520 Stratford Road, Pomfret, Maryland 20675.

11.     Defendant Timothy R. Barnett is a Residential Reentry Manager for the BOP, and, upon information and belief, resides at 954 Fall Ridge Way, Gambrills, Maryland 21054.

12.     Defendant Cheryl Dennings is a Community Corrections Administrator for the BOP and, upon information and belief, resides at 7344 Hillview Court, Douglasville, Georgia 30134.

13.     Defendant Lola Lee-Brown is a Contracting Officer for the BOP, and, upon information and belief, resides at 4238 Jamaica Street, Dallas, Texas 75210.

14.     Defendant Osoria Toston was a Contract Oversight Specialist for the BOP, and is now an employee of Dismas Charities, Inc., a competitor to Bannum.  Upon information and belief, she resides at 192 Mountain Laurel Road, Wetumpka, Alabama 36093.

15.     Defendant Andrea Johnson was a Community Corrections Regional Coordinator ("CCRA") for the BOP, and is now Regional Vice President of Dismas Charities, Inc., a competitor to Bannum.  Upon information and belief, she resides at 2107 Sweet Adeline Lane, Keller, Texas 76248.

4

16.     The names of any additional Defendants are unknown to Plaintiff at the present time.   Plaintiff will amend the Complaint by substituting the true names of these unknown defendants and charging each of them individually and accordingly.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C §§ 1331 and 1367(a).

18.     The Court has personal jurisdiction over each of the Defendants pursuant to D.C. Code § 13-423(a).

19.     Venue is proper in this district under 28 U.S.C. §1391(b)(2) and (e).

## BACKGROUND

20.     On October 28, 1993, Bannum filed an action against the United States and various BOP officials and employees, including Tom Harrigan, in the United States District Court for the Western District of Tennessee (Case No. 93-2957) (hereinafter referred to as the "Tennessee Lawsuit") wherein Bannum sought a "level playing field," where it would be given the opportunity to compete with other contractors for BOP RRC contracts.

21.     In the Tennessee Lawsuit, Bannum alleged several causes of action against the BOP and individual defendants for several causes of action, including *de facto* debarment, constitutional violations, conspiracy, and several bid protests for various contracts.

22.     Bannum later dismissed the Tennessee Lawsuit without prejudice upon the belief, based upon BOP representations, that Bannum would be afforded the "level playing field" it sought with respect to all future RRC procurements.

23.     Bannum was subsequently awarded several new RRC contracts by the BOP through negotiated procurements.  As recently as 2011, Bannum was under contract for some seventeen (17) centers, as follows:

- Beaumont, TX
- Charleston, WV
- Clarksburg, WV
- Corpus Christi, TX
- Fayetteville, NC
- Florence, SC
- Greensboro, NC
- Jackson, MS
- Laredo, TX
- Montgomery, AL
- Orlando, FL
- Reno, NV
- Savannah, GA
- Tallahassee, FL
- Tupelo, MS
- Washington, DC
- Wilmington, NC

24.     However, based upon the Defendants' actions to eliminate Bannum, the number of contracts is rapidly declining, and is currently down to six (6), as follows:

- Beaumont, TX – DJB200991
- Greenville, SC – DJB200233
- Jackson, MS – DJB200157
- Saginaw, MI – DJB200139
- Wheeling, WV – DJB200099
- Wilmington, NC – DJB200200

25.     Despite settlement of the Tennessee Lawsuit and a brief reprieve from the illegal treatment complained of in previous litigation, the Defendants have engaged in a systematic effort to damage Bannum's business reputation, to ultimately to prevent it from being awarded contracts, and to put it completely out of business.

6

26.     In so doing, Defendants have violated Bannum's constitutionally protected rights to equal protection and due process, and caused it severe financial damage, for which Bannum herein seeks, and for which it is entitled to, compensation.

27.     Defendants have gone back on the BOP's promise to Bannum to provide it with a "level playing field" in awarding new contracts and put Bannum back in the same position it was in prior to the Tennessee Lawsuit.

28.     Subsequent to the resolution of the Tennessee Lawsuit, Bonnie Sinsel became Chief of Community Corrections Contracting for the BOP at the Central Office in Washington D.C., and Gina Mustain took over as the BOP's Community Corrections Regional Administrator ("CCRA") for the entire South Central Region, where Bannum had a number of contracts.

29.     As CCRA for the South Central Region, Mustain had direct control and authority over other subordinate BOP employees.

30.     Andrea Johnson was one of the BOP's Contracting Officers in the South Central Region who gave Bannum a very difficult time.

31.     Gina Mustain has stated in the presence of other BOP officials that Bannum would never get another contract from the BOP in the South Central Region where Bannum had a number of its RRCs.

32.     Upon information and belief, Catherine Scott, who also worked with Gina Mustain and Andrea Johnson, has risen through the ranks of the BOP to become Chief of the National Acquisitions and Systems Section.

33.     Upon becoming the Chief of the National Acquisitions and Systems Section overseeing all BOP contracts, Catherine Scott continued the scheme that had been going on in

the past to put Bannum out of business and ensure that it does not receive any new government contracts.

34.     Upon information and belief, Catherine Scott has stated to other members of the BOP that she does not trust Bannum or that Bannum could not be trusted.

35.     Upon information and belief, the BOP attorney who works closely with Catherine Scott has stated that the BOP would be better off without Bannum.

36.     Despite having as many as seventeen (17) contracts at one point, the BOP has not given Bannum a new contract since 2011.  The BOP has only exercised options and continued contracts in areas where Bannum was the only contractor that could perform services.

37.     Furthermore, Scott has pursued a campaign to treat Bannum differently than other contractors.

38.     Scott has also caused contracts to be awarded to Bannum's competitors that currently employ ex-BOP officials.

39.     Dismas Charities is a Bannum competitor that has recently been given many contracts for regions which were previously serviced by Bannum.  Dismas Charities employs several former BOP officials, such as former Contracting Officer Andrea Johnson and former Contract Oversight Specialist Osoria Toston.

40.     Upon information and belief, Scott has conspired with others, both within and outside the BOP, to carry out a systematic effort to ensure that Bannum would not be awarded any other contracts where competition from other offerors is involved.

41.     Upon information and belief, Defendants have engaged, and are engaging, in what amounts to a concerted campaign or pattern of financial intimidation against Bannum in retaliation for filing claims and asserting its contractual rights.

42.     This pattern of conduct by Defendants includes, but is not limited to, refusing to pay Bannum monies it is owed on its contracts, delaying payment to Bannum for monies it is owed, refusing to pay Bannum for undisputed claim amounts, and diverting residents and revenue away from Bannum and over to its competition, resulting in the loss of hundreds of thousands of dollars per month.

43.     Furthermore, Defendants have also attempted to steer contract awards to companies that employ or are owned by former BOP officials and companies that do not assert their legal rights to compensation for Service Contract Act wage determination reimbursements.

44.     Defendants have engaged in a course of conduct to destroy Bannum through their conduct and actions by, among other things:

(a)     making negative, false, defamatory, and inflammatory statements to BOP employees and others regarding Bannum;

(b)     refusing to pay Bannum's invoices in an attempt to drive Bannum out of business;

(c)     maliciously conducting investigations for alleged wrongdoings that clearly were beyond the scope of Bannum's contracts;

(d)     improperly diverting inmate referrals to Bannum's competitors in order to punish Bannum;

(e)     improperly forcing Bannum to terminate employees;

(f)      initiating and conducting improper investigations of Bannum in an attempt

to preclude Bannum from further contract awards;

BEAUMOUNT DEFAULT

45.      In or about December 2011, Defendant Scott intensified her effort to rid the BOP

of Bannum.

46.      Bannum's contract to operate a RRC in Beaumont, Texas, was terminated for

default by Contracting Officer Wesley Jenkins effective November 30, 2011, the very last day of

the contract's base period.

47.      Bannum had operated a facility in Beaumont under consecutive BOP contracts

since 1997.  On or about December 1, 2009, BOP awarded a new contract to Bannum, contract

no. DJB200991.

48.      This contract provided for a two-year base period with three one-year options.

49.      Zoning was very restrictive in Beaumont, but Bannum was successful in obtaining

the required zoning.

50.      Prior to the termination, on October 25, 2011, the BOP, along with James Hardy

of Cornell / Liedel Comprehensive Sanctions Center ("Cornell") in Houston, TX, visited

Bannum's facility and took Bannum's Facility Director out to lunch.

51.      Then, just two days after the BOP paraded Bannum's competitor through its

facility, Jenkins issued a Cure Notice to Bannum, notifying Bannum that its contract may be

defaulted.

52.      Bannum responded to the Cure Notice in detail on November 9, 2011.

53.     However, Defendants waited until November 28, 2011, to issue a Termination Notice, stating that the contract was terminated for default effective November 30, 2011, the very last day of Bannum's contract performance.

54.     After the Contract was defaulted, the BOP actually pulled the inmates out of the facility and sent them to the Houston area where the competitor was located.

55.     As a general policy, the BOP seeks to house inmates in RRCs nearest to the inmates' home communities.

56.     Prior to defaulting Bannum's contract, the BOP issued deficiency notices and took deductions against Bannum's contract that subsequently turned out to be without merit, resulting in the withdrawal of the notices and the reimbursement of the monies to Bannum.

57.     After the matter was appealed to the Civilian Board of Contract Appeals ("CBCA"), and the BOP was unsuccessful in replacing Bannum's contract in Beaumont, Defendant Scott was forced to reinstate the contract to Bannum because the inmates were going to be released in the Beaumont area, not Houston.

58.     While this matter was resolved before the CBCA, resulting in the reinstatement of Bannum's contract, Defendants' action is evidence of their continuing course of conduct to eliminate Bannum from any further BOP procurements.

59.     In this particular action, the default backfired, and the only reason why the contract was reinstated was because Bannum was the only contractor to be able to get the required zoning in the Beaumont area.

BEAUMONT INVESTIGATION

60.     Bannum's reinstated contract for the Beaumont area is nearing its conclusion, and the BOP is currently soliciting offers for another contract for the area.

61.     Tellingly, while previous procurements for these RRC services stated that the BOP was seeking RRC services "within the city limits of Beaumont, Texas," the BOP's July 14, 2014 announcement states that "[t]he location for the facility providing the above services is to be in Jefferson County, TX."

62.     Proposals for the solicitation were due on December 15, 2014, with the BOP having issued a request for Final Proposal Revisions on April 14, 2015.

63.     On June 16, 2015, BOP Residential Reentry Manager Lola Lee-Brown sent Bannum President John Rich a notice that facility director Nancy Hester was prohibited from working with federal offenders, effective immediately.

64.     Defendant Brown stated that "[t]his action is taken pending disposition of allegations Ms. Hester violated the Employee Standards of Conduct."

65.     Defendant Brown provided no information regarding what alleged violations Ms. Hester committed, nor the source of such allegations.

66.     Thus, it is impossible for Bannum to address the merits of the alleged violations.

67.     Upon information and belief, Defendants are seeking to steer the award of the next BOP contract to any contractor other than Bannum.

68.     Upon information and belief, this is a continuation of the BOP's pattern of conduct before awarding the next contract to another contractor.

## TUPELO INVESTIGATION

69.     Bannum had been under contract with the BOP for over 20 years to supply RRC

services in Tupelo, Mississippi.

70.     While that contract was up for renewal and during the bidding evaluation period

for the follow-up contract, on the evening of March 3, 2013, the BOP, DOJ, OIG, U.S. Marshals,

Tupelo Police Department, and Tupelo Sheriff's Office raided Bannum Place of Tupelo.

71.     During the raid, the Director of the Bannum facility arrived, and was immediately

escorted to her office and questioned for about an hour and a half.

72.     Bannum's Director was not informed of her personal constitutional rights, nor

was she afforded the opportunity to consult counsel prior to the commencement of the

questioning.

73.     Bannum's current contract files were confiscated by the BOP.   Prior to the

removal of the files, Bannum was not consulted, nor given any opportunity to object, provide

input, or intervene with respect to its contracts.   The files confiscated were not logged or indexed

before they were confiscated.

74.     During the raid, the facility was damaged.   Several ceiling tiles were cracked or

broken and the agents performing the raid left a tile open in the hallway with exposed wires, as

well as a sanitation mess.

75.     Soon after the raid, BOP Community Corrections Administrator Cheryl Dennings,

upon information and belief, at the direction of Defendant Scott, requested that Bannum explain

how it was operating without the use of the files that were confiscated.

13

76.     Bannum explained that it was making the best out of a bad situation.  Bannum further explained that not having the contract files also raised other issues, such as not being able to pay for prescription reimbursements, and hindering the ongoing required filing of paperwork.

77.     Approximately a week and a half later, a number of documents which were confiscated were returned in several plastic bags, which appeared to be the inmate files.  All of these files were taken out of organized binders and returned to Bannum in a disorganized mess, with papers inside plastic bags.

78.     Many of the original paperwork items had been replaced with photocopies, and many logs and other documents remain missing to this date.

79.     Bannum still has not been provided with all of its files and documents, and the documents that were returned were not in the same condition as when they were confiscated.  Therefore, Bannum had to expend time and effort in attempting to determine what documents were still missing and reorganizing the documents that were returned.

80.     Despite Defendants' bad faith efforts, the BOP raid apparently showed no wrongdoing, as there was never any follow-up to the raid.

81.     The BOP subsequently awarded the follow-on contract to Bannum's competitor, Dismas Charities.

### CLARKSBURG INVESTIGATION

82.     Bannum had been under Contract with the BOP to supply RRC services in Clarksburg, West Virginia since approximately 1993.

83.     In or around January, 2015, while a solicitation for the follow-on contract was outstanding, there was an ice storm in Clarksburg, which severely damaged Bannum's roof.

14

84.     Defendant Barnett insisted that all inmates had to be moved out of the facility, even though Bannum was in the process of repairing the roof leaks.

85.     Defendant Barnett went behind Bannum's back and communicated with the City of Clarksburg Codes Office, insisting that Bannum's certificate of occupancy be revoked, alleging that the water damage from the leaking roof would cause mold.

86.     When these efforts failed to close Bannum's facility, Defendants then turned to investigating Bannum's employees.

87.     Defendant Barnett subsequently sent Plaintiff a letter, alleging that his office received evidence to support an allegation against Bannum Place of Clarksburg Director Belinda Moore.

88.     Defendant Barnett alleged that Ms. Moore came into the facility intoxicated, and also alleged unprofessional conduct.

89.     Defendant Barnett stated that Director Moore was precluded from working with federal offenders until further notice.

90.     Bannum was not provided any information regarding the alleged evidence supporting such an allegation against Bannum's facility Director.

91.     Upon information and belief, such evidence consists of nothing more than rumors or allegations from inmates.

92.     Around that time, Bannum was advised that the follow-on contract was awarded to Dismas Charities, Inc.

FAYETTEVILLE INVESTIGATION

93.     Bannum had been under contract with the BOP to supply RRC services in Fayetteville, North Carolina for approximately 23 years.

94.     Defendants recently awarded the follow-on contract to another contractor, Alston Wilkes Society.

95.     Around the time of the award of the follow-on contract, the BOP contacted Bannum's facility and advised the facility Director that there were allegations of wrongdoing by the Director, and that the Director soon would be suspended.

96.     Rather than face suspension, the Director resigned.

REFUSAL TO COOPERATE

97.     In about March 2013, the BOP unilaterally modified Bannum's ongoing contracts to incorporate the requirements of the Prison Rape Elimination Act ("PREA").

98.     Bannum made a number of requests for additional information and clarification as to how the PREA requirements were to be incorporated, since the law was vague and failed to provide certain information regarding the implementation of PREA.

99.     Additionally, since Bannum is running a halfway house, and not a prison, the alleged PREA requirements conflict with other requirements of its contracts, such as the Employee Code of Conduct.

100.    Defendants refused to provide the information requested by Bannum, instead alleging that it was Bannum's responsibility to determine what needed to be done to comply with the new requirements.

101.    Based upon this refusal and lack of cooperation, Bannum filed requests for equitable adjustment, including requests for contract interpretation.

102.    Defendants did not respond to Bannum's requests, and Bannum subsequently converted its requests into claims for equitable adjustment and for contract interpretation.

103.    Instead of providing Bannum with the requested information, or at least cooperating with Bannum to see how it could be of assistance, the BOP Contracting Officers summarily denied the claims, stating that Bannum could find its answers to any questions that it has on Government websites.

104.    There is little information on those Government websites that answer the questions posed by Bannum.

105.    Since that time, BOP personnel have been demanding that Bannum add extra personnel to its contracts in order to comply with the vague and conflicting PREA requirements.

106.    The Defendants will not cooperate with Bannum, and upon information and belief, the Defendants are trying to use these vague requirements to continue to strip Bannum of its current contracts and future contract awards.

107.    While an appeal of the denial of the claim has been filed with the Court of Federal Claims, this PREA issue is being alleged to show the continuing course of conduct on the part of the Defendants to shut Bannum down and eliminate Bannum from competing for future BOP business.

## VIOLATIONS OF THE ANTI-DEFICIENCY ACT

108.   Throughout the terms of Bannum's contracts, Defendants would issue unilateral modifications, thereby increasing the amount of wages that Bannum was required to pay its employees.

109.   The unilateral modifications also required the BOP to timely reimburse Bannum for those increased wages.

110.   After receipt of these modifications, Bannum would be forced to submit a Request for Equitable Adjustment ("REA") seeking reimbursement for those increased wages. At times, these outstanding REAs would amount to hundreds of thousands of dollars.  The BOP would refuse to timely reimburse Bannum.

111.   Upon information and belief, at the time that the unilateral modifications were issued, Defendants did not have proper funding mechanisms in place, thus violating the Anti-Deficiency Act.

112.   The Anti-Deficiency Act prohibits contracts purporting to bind the Government beyond the obligational characteristics of the appropriations, and has criminal penalties for the Contracting Officers involved (*see* 31 U.S.C. §1341(a)(1)(A)).

113.   Violations of the Anti-Deficiency Act can occur in a number of ways, including making payments against and exhausting an insufficient appropriation.

114.   Prior to issuing the unilateral modification, and upon information and belief, Defendants either knew or should have known the extent of the cost increase.

115.   Instead of either requesting this information from Bannum, negotiating with Bannum, or including a dollar amount in the modification so that Bannum would have at least

some compensation, Defendants have engaged in a scheme that forced Bannum to finance the added costs, which at times amounted to hundreds of thousands of dollars.

116.    Bannum would then have to incur a tremendous amount of time and effort seeking reimbursement for this extra cost that has been continuously foisted upon Bannum.

117.    Even after Defendants issued the unilateral modification, they would stall the resolution, and often times issue another unilateral modification that incorporated yet another wage determination.

118.    By this time Defendants would have actual numbers on what the BOP owed Bannum for the initial wage determination, but they still refused to provide Bannum with relief.

119.    There also came a point in time where an agreement was reached and an invoice was submitted but the BOP refused to pay the invoice.

120.    The fact that Defendants would take, in some cases, years to reimburse Bannum for a unilateral modification for a simple wage increase reimbursement and refuse to pay even after an agreement was reached further establishes that Defendants did not have the appropriate funding in place for the increased wage determinations.

121.    Defendants could not have encumbered the Government by issuing a unilateral modification without establishing a dollar amount at the time the unilateral change order was issued.

122.    The amount that the BOP could have estimated at the time of the issuance of the unilateral change order should have been paid to Bannum on a timely basis, instead of forcing Bannum to fight to be compensated for monies to which it was entitled.

123. Upon information and belief, other contractors subject to similar modifications did not submit REAs or, if they were submitted, timely resolution occurred.

124. As a result of Bannum fighting for the money that it is owed by being forced to file REAs, Defendants treated Bannum differently, punishing Bannum by delaying payments and then downgrading its ratings on contract evaluations so that they could justify giving contracts that Bannum has had for years to other, more favorably rated, contractors.

125. Upon information and belief, Defendants have openly stated that the BOP is better off without Bannum.

126. Defendants' violations of the Anti-Deficiency Act and their punishing Bannum by treating Bannum differently violated Bannum's rights to be able to compete and operate on a fair and level playing field without being punished for exercising its contractual rights to collect monies owed to it that it should not have been forced to finance to begin with.

127. Bannum also seeks a declaration that the Defendant Contracting Officers violated the Anti-Deficiency Act.

## CPARs

128. Per the terms of Bannum's contracts, the BOP was to conduct performance reviews and issue Contractor Performance Assessment Reports ("CPARs"), which rate each aspect of Bannum's performance.

129. These CPARs were to be issued annually, shortly after the end of each contract year. The CPARs are utilized for Past Performance evaluations.

130. Bannum alleges that it has been continually victimized by the Defendants' negligent and intentional misuse of the CPAR process, which has had a detrimental and

prejudicial effect on Bannum's past performance ratings and has forced Bannum to expend needless and significant effort trying to protect its reputation.

131.   Defendants' prejudicial and improper actions in regard to the CPAR process include, but are not limited to:

(a)   failing to issue the CPARs in a timely manner;

(b)   assessing improper and false ratings;

(c)   giving false ratings that do not reflect the actual findings of the interim monitorings;

(d)   failing to take into consideration Bannum's responses to proposed CPARs before issuing the final document, as required;

(e)   making final overall ratings that do not reflect the actual findings in the full report;

(f)   using past deficiencies in a current CPAR rating;

(g)   improperly delaying the release of the CPARs to Bannum;

(h)   delaying responding to Bannum's responses to the CPARs;

(i)   issuing final CPARs without Bannum have the opportunity to respond; and

(j)   lowering ratings after Bannum issued its responses to CPARs.

132.   Each of these actions has had a significant, detrimental effect on Bannum.

133.   Defendants were notoriously slow in issuing the CPARs and/or releasing them to Bannum for response.

134.    In numerous cases, the CPARs were issued months after the specific performance period ended and in many cases, the CPARs were not sent to Bannum until well after the CPARs were actually drafted.

135.    This negligent and/or bad faith behavior had a prejudicial effect on Bannum's ability to adequately respond and rebut the erroneous assertions contained in the CPARs.

136.    Additionally, when the issuance and/or delivery of the CPAR was delayed, the subsequent performance period had already begun.

137.    Therefore, as a result of these delays, Bannum was deprived of the opportunity to have its perceived strengths and weaknesses as they may relate to the subsequent evaluation period properly evaluated.

138.    Defendants would inexplicably and unjustifiably lower Bannum's CPAR ratings between the issuance of the first report and the final report.

139.    For example, on October 29, 2013, Bannum received the initial CPAR for the latest performance period of Bannum's Greenville contract, which ended on July 31, 2013.

140.    This version of the CPAR was replete with performance descriptions which included the words "excellent," "exceptional," and "extraordinary."

141.    Bannum responded to this CPAR on November 26, 2013, which included a response to the CPAR referencing alleged deficiencies that occurred before the performance period.

142.    On April 2, 2014, Bannum was notified that the CPAR had been finalized.

143.    However, almost five-months later, Bannum received a second version of the same CPAR.

144.   Inexplicably, the language contained in this version was identical, except that all the superlative language delineated above was eliminated and arbitrarily and unjustifiably replaced with lesser terminology.

145.   The above-described scenarios are but two of innumerable examples than can be cited regarding the Defendants' intentional and negligent use of the CPAR process.

146.   These scenarios occurred continuously on each of Bannum's contracts on an annual basis.

147.   Bannum alleges that this improper manipulation and misuse of the CPAR process has had a devastating effect on Bannum.

148.   After the final CPARs are issued by the BOP, they serve as the main source of information used to evaluate Bannum's past performance rating for purposes of future procurements.

149.   As a result of Defendants' improper actions, Bannum's CPAR ratings were detrimentally impacted, which, in turn, prejudicially affected its ability to be awarded future contracts.

150.   Bannum alleges that Defendants are using the CPAR process in bad faith, for the purpose of attempting to put Bannum out of business.

COUNT I
(De Facto Debarment)

151.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 150 as if set forth fully herein.

152.   Bannum has performed contract services for the federal government since 1984, primarily operating RRC services for the Federal Bureau of Prisons.

153.    As recently as 2011, Bannum had upwards of 17 BOP contracts.

154.    Since that time, several Defendants have gone to work for Bannum competitor Dismas Charities, including but not limited to Andrea Johnson and Osoria Toston.

155.    In or around 2011, Bannum started to hear rumors and statements that Bannum could not be trusted, and that the BOP would be better off with Bannum out of business.

156.    Defendants have engaged in a campaign to sabotage Bannum's business.

157.    Bannum has held a number of contracts for many years, in some instances spanning decades.

158.    When Bannum contracts would come up for a new award, Defendants would begin unwarranted investigations into Bannum and its employees, and in several cases, Bannum employees have been suspended by the BOP without due process.

159.    Bannum has not been awarded any new contracts since 2011.  The BOP has only exercised options and continued contracts in areas where Bannum was the only contractor that could perform services.

160.    The only exception is a contract for a facility in New Orleans, Louisiana, pursuant to RFP No. 200-1244-WS.  However, Defendants have not allowed Bannum to proceed on that award.

161.    The rumors, statements, and actions by Defendants constitute an illegal *de facto* debarment of Plaintiff from receiving contracts from the BOP.

162.    Bannum has been given no grounds for this debarment, and no ability to refute any such grounds.

163.    Such a debarment, tinged with allegations of a lack of integrity on the part of Bannum, implicate the due process clause of the 5th Amendment to the United States Constitution, and requires, at minimum, proper notice to Bannum of the charges on which the debarment is based, and that Bannum be afforded an opportunity to refute those charges.

164.    No such notice was issued, and no such opportunity granted.

165.    The debarment of Bannum by Defendants was an illegal *de facto* debarment in violation of the due process clause of the Fifth Amendment and must be set aside.

166.    Defendant Samuels is the Director of the Bureau of Prisons, and as such, is responsible for assuring that in all its operations, including procurement of goods and services, the BOP complies with all laws of the land, including the due process clause of the Fifth Amendment to the United States Constitution.

167.    Defendant Samuels failed in his duty to assure that the BOP complied with the Fifth Amendment to the United States Constitution in the debarment of Bannum without due process of law.

168.    Defendant Scott is the Chief of the BOP National Acquisitions and Systems Section, and as such has a duty to ensure that in all its operations, including procurement of goods and services, the BOP complies with all laws of the land, including the due process clause of the Fifth Amendment to the United States Constitution.

169.    Defendant Scott failed in this duty, in that she failed to ensure that the BOP complied with the Fifth Amendment to the United States Constitution in the debarment of Bannum without due process of law.

170.     Defendant Dennings is a Community Corrections Administrator for the BOP, and as such has a duty to administer RRC operations and programs in good faith.

171.     Defendant Dennings failed in this duty, in that she has failed to administer RRC operations and programs in good faith.

172.     Defendant Lee-Brown is a Contracting Officer for the BOP, and as such has a duty to enter into, administer, negotiate, award, cancel, and/or terminate contracts, and make related determinations and findings on behalf of the United States Government in good faith.

173.     Defendant Lee-Brown failed in this duty, in that she has failed to enter into, administer, negotiate, award, cancel, and/or terminate contracts, and make related determinations and findings in good faith.

<u>COUNT II</u>
(Interference With Contractual Relations, Prospective Contractual Relations, and Prospective Advantageous Economic Relationship)

174.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 173 as if set forth fully herein.

175.     Defendants Samuels, Scott, Barnett, Dennings, and Lee-Brown are sued in this action in their personal, as well as official capacities.

176.     By a series of actions, delineated in this first amended complaint, Defendants Samuels, Scott, Barnett, Dennings, and Lee-Brown have used and misused their positions and authority as employees of the BOP to interfere with and disrupt the existing and prospective business relationships of Plaintiff Bannum, Inc. to the point of destroying those relationships and eliminating Plaintiff Bannum, Inc. as a contractor by, among other things, the following acts:

(a)     making negative, false, defamatory, and inflammatory statements to BOP employees and others regarding Bannum;

(b)     refusing to pay Bannum's invoices in an attempt to drive Bannum out of business;

(c)     maliciously conducting investigations for alleged wrongdoings that clearly were beyond the scope of Bannum's contracts in an attempt to preclude Bannum from further contract awards;

(d)     improperly diverting inmate referrals in order to punish Bannum;

(e)     improperly forcing Bannum to terminate employees; and

(f)     violating the Anti-Deficiency Act.

177.     Defendants Samuels, Scott, Barnett, Dennings, and Lee-Brown, by their conduct and actions, have endeavored to disrupt and destroy the ongoing business relationships of Bannum.

178.     Defendants Samuels, Scott, Barnett, Dennings, and Lee-Brown acted to disrupt and destroy the ongoing business relationships of Bannum, and, in their personal and official capacities, violated clearly established statutory and constitutional rights of Plaintiff which a reasonable person would have known.

179.     Defendants Samuels, Scott, Barnett, Dennings, and Lee-Brown acted to disrupt and destroy the ongoing business relationships of Bannum in their personal and official capacities, knowing they clearly violated established statutory and constitutional rights of Plaintiff.

180.     Defendants Samuels, Scott, Barnett, Dennings, and Lee-Brown have no immunity from personal liability for the consequences of their interference with Plaintiff's contractual

27

relations, prospective contractual relations, and prospective advantageous economic relationships, as alleged above herein, because:

(a)      Defendants Samuels, Scott, Barnett, Dennings, and Lee-Brown, in their official capacities, violated clearly established statutory and constitutional rights of Plaintiff of which a reasonable person would have known; and

(b)      Defendants Samuels, Scott, Barnett, Dennings, and Lee-Brown, in their official capacities, knowingly violated clearly established statutory and constitutional rights of Plaintiff.

181.    Plaintiff, Bannum, Inc., has been damaged in an amount in excess of $10,000,000.00, as a result of Defendants' intentional conduct cited above.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Bannum, Inc. hereby requests that this Court grant the following relief:

(1)      Judgment under the Declaratory Judgment Act and the Fifth Amendment to the United States Constitution that the above-named Defendants violated the constitutional rights of Plaintiff Bannum, Inc. in the debarment of Plaintiff Bannum, Inc. without due process of law;

(2)      Injunctive Relief against the above-named Defendants setting aside the illegal debarment and requiring that Plaintiff Bannum, Inc. be reinstated to the position it was in prior to the debarment, and that all work denied to Plaintiff Bannum, Inc. as a result of the debarment be restored to Plaintiff Bannum, Inc. as if the debarment had not occurred.

(3)      Issue a judgment against defendants Catherine Scott and her subordinates for damages resulting from their interference with Plaintiff's contractual relations;

(4)      Award damages in excess of $10,000,000.00;

28

(5)      Award Plaintiff costs and attorney's fees; and

(6)      Award Plaintiff such other and further relief as the Court deems just and proper.

<u>REQUEST FOR JURY TRIAL</u>

Plaintiff hereby requests a trial by jury on all claims so triable.

THOMPSON HINE LLP

Dated: August 3, 2015                        By:_____/s/ Eric Heyer_____
                                                                     Eric N. Heyer
                                                                     1919 M Street, N.W., Suite 700
                                                                     Washington, D.C. 20036
                                                                     Phone: (202) 331-8800
                                                                     Fax: (202) 331-8330
                                                                     eric.heyer@thompsonhine.com

                                                                     *Local Counsel for Plaintiff Bannum, Inc.*

                                                                     Of Counsel:

                                                                     Joe Camardo, Esq.
                                                                     Justin Huffman, Esq.
                                                                     CAMARDO LAW FIRM, P.C.
                                                                     127 Genesee Street
                                                                     Auburn, New York 13021
                                                                     Phone: (315) 252-3846
                                                                     Fax: (315) 252-3508

                                                                     *Counsel for Plaintiff Bannum, Inc.*

29